IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SEAN WANG, | § | |
| | § | |
| *Plaintiff,* | § | Civil Action _____ |
| | § | |
| vs. | § | |
| | § | |
| SOUTHERN METHODIST UNIVERSITY, | § | JURY DEMANDED |
| | § | |
| | § | |
| *Defendant.* | § | |

**PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND**

TO THE HONORABLE JUDGE:

Plaintiff Sean Wang, Ph.D. presents his Complaint for unlawful discrimination and retaliation in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (the "Civil Rights Act of 1866").

**NATURE OF THIS ACTION**

1.  Southern Methodist University (SMU) has a systemic problem with race discrimination and retaliation.

2.  This suit seeks to enforce the Civil Rights Act of 1866 to hold SMU accountable and deter it from further discrimination and retaliation.

3.  This suit includes a request for injunctive relief.

**JURISDICTION AND VENUE**

1.  This is a suit authorized and instituted pursuant to the Civil Rights Act of 1866, 42 U.S.C. § 1981; and declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

2. Jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1343(a)(4) and 28 U.S.C. § 1331.

3. Venue of this Court is pursuant to 28 U.S.C. § 1391(b), as SMU is located in the judicial district in which a substantial part of the events giving rise to this claim occurred.

**PARTIES**

**A. Dr. Wang**

4. Dr. Wang is a citizen and resident of the United States, residing in Dallas County, Texas.

5. Dr. Wang is Chinese-American.

**B. Defendant**

6. SMU is a private university located in Dallas, Texas.

7. SMU may be served a summons in this case by serving its registered agent, Paul J. Ward, at its registered address, Perkins Admin Bldg., 6425 Boaz Lane, Room 139, Dallas, Texas 75205.

**FACTUAL ALLEGATIONS**

**Background**

1. SMU has a written policy that it is an equal opportunity employer and does not tolerate discrimination or retaliation.

2. SMU does not follow its own policies, does not monitor the workplace for signs or red flags of discrimination or retaliation, and does not take necessary action to prevent or correct discrimination or retaliation.

3. SMU does not care about workplace laws.

4. Discrimination and retaliation are significant problems in the workplace in the United States.

5. Discrimination and retaliation are foreseeable in the workplace and demands preventative action.

6. Several statistical studies show that well over a majority of persons surveyed say they experience discrimination in the workplace.

7. Statistical studies also show that fear of retaliation is a significant problem in the workplace.

8. Foreseeability is important because the law is meant to be preventative.

9. The federal anti-discrimination laws primary objectives are prophylactic, chiefly aimed not to provide redress but to avoid harm.

10. Employers must take appropriate steps to prevent and correct discrimination and retaliation.

11. SMU did not protect Dr. Wang from discrimination or retaliation.

12. SMU's discrimination and retaliation against Dr. Wang caused him substantial damages.

**The Tenure Process**

13. SMU's Edwin L. Cox School of Business Promotion and Tenure Manual states that the productivity standard for tenure is "at least four (4) top-tier publications within the six (6) year probationary period."

14. SMU provides a specific list of 70 journals which count as "top-tier" in their promotion and tenure policy manual. *See* SMU, Edwin L. Cox School of Business Tenure Policy and Procedures 1.1(I).

15. Since at least 2006, when Hemang Desai (an Indian-Origin faculty member) became a full professor in SMU's Cox School of Business, the Accounting Department granted tenure to 100 percent of Indian-origin candidates (two of two) who met the published "four top-tier publications" standard, while denying tenure to 100 percent of non-Indian candidates (zero of five) who met the same standard.

16. Dr. Wang is a distinguished accounting scholar who graduated from Cornell University with a PhD in accounting and previously worked at the UNC Kenan-Flagler School of Business.

17. SMU hired Dr. Wang in November 2017 as an Assistant Professor in by SMU's Cox School of Business.

18. At the time of his hiring, Dr. Wang had already established himself as a highly productive researcher, already qualified for tenure, with four publications from SMU's designated top-tier list.

19. Nevertheless, Chair Hemang Desai and Associate Dean Bill Dillon nevertheless told him he should add "one or two more" before seeking early tenure because he was coming from another school.

20. Dr. Wang has published ten articles in top-tier journals—more than double any other Cox School faculty member in the department's history at the time of their tenure application.

21.     Dr. Wang's research productivity significantly exceeds that of his tenured Indian colleagues in the department when they received tenure.

**Pattern of Discrimination Against Non-Indian Faculty**

23.     Since Hemang Desai (Indian-origin) became a full professor at SMU in 2006, its Accounting Department has had a systematic pattern of discrimination in tenure decisions.

24.     Among candidates of Indian descent who meet SMU's stated productivity standard of at least four top-tier publications, 100% (2 of 2) were tenured: Neil Bhattacharya in 2008 and Gauri Bhat in 2020.

25.     Among candidates of non-Indian descent (Caucasian and Chinese) who meet SMU's stated productivity standard of at least four top-tier publications, SMU has not supported any non-Indian candidates for tenure, including Mina Pizzini, Chris Hogan, Jing Pan, Jeff Yu and Dr. Wang.

26.     This represents a zero percent success rate (zero of five).

27.     This pattern is consistent with an ancestry-based preference for Indian-origin candidates and disfavor toward non-Indian candidates.

28.     SMU denied tenure support for Mina Pizzini, Ph. D., a Caucasian candidate who exceeded the productivity standard, tenure.

29.     Dr. Pizzini subsequently filed a lawsuit against SMU, which was settled out of court.

30.     Dr. Pizzini is now the Department Chair at Texas State University.

31.     SMU denied tenure support for Chris Hogan, Ph. D., a Caucasian candidate who exceeded the productivity standard.

32. Dr. Hogan is now the Russell E. Palmer Endowed Professor in Accounting at Michigan State University.

33. Tenure decisions in the Accounting Department systematically treated candidates of Indian ancestry more favorably than non-Indian candidates who met the same standard. But for Dr. Wang not being of Indian ancestry (he is Chinese/East-Asian), SMU would have granted him tenure.

**Discriminatory Treatment of Dr. Wang**

34. From the beginning of his employment, SMU subjected Dr. Wang to different and more stringent standards than his Indian colleagues.

35. Despite attaining the additional publications beyond the original tenure requirements as asked by Chair Desai and Dillon, in May 2020 when Dr. Wang requested early tenure consideration, SMU denied him and repeatedly told Dr. Wang that he needed to meet additional, shifting criteria including "more citations," "more visibility."

36. From May 2020 to February 2022, Dr. Wang increased his citations and visibility substantially to exceed the citation count of the all three Indian professors granted tenure in the Accounting department.

37. Instead of departmental approval in his February 2022 third-year review, Dr. Desai, Dr. Bill Dillon and Dr. Wayne Shaw confronted Dr. Wang regarding his performance and gave him harsh criticism despite Dr. Wang had five top-tier publications and strong teaching evaluations.

38. SMU's specifies in its three-year contract at the time of employment, a review of an assistant professor's progress toward tenure is conducted during the Spring semester of the candidate's third year.

39. Candidates that have a successful third-year review are awarded a second contract, while those whose contracts are not renewed are entitled to one additional, but terminal, year of employment.

40. In the Spring of his third year, SMU gave Dr. Wang a successful review and awarded him a second contract.

41. Despite a successful third-year review and renewal award, Dr. Desai, Dr. Dillon and Dr. Shaw told him he was a "bad fit" for the department due to his behavioral research methodology and should voluntarily resign.

42. The "bad fit" rationale was pretextual, as Dr. Wang's behavioral research papers were prominently featured in letters to Dr. Desai and SMU accounting department regarding his 2017 job application materials and had been publicly available and circulating in the profession for nearly a decade before 2022.

43. In contrast, in the same month (Feb 2022), Dr. Desai praised Dr. Wang's Indian colleague Sorabh Tomar, Ph. D. in his mid-career review, despite Dr. Tomar having no publications at the time of his third-year review.

44. Dr. Desai made no mention of "bad fit" for Dr. Tomar despite Dr. Tomar also having a behavioral paper using experimental methodologies with the same co-author as Dr. Wang.

45. As Chair, Dr. Desai exercised substantial control over the tenure process. His role is central to the pattern whereby Indian-origin faculty received support and tenure while non-Indian faculty, including Dr. Wang, were subjected to shifting and more stringent standards.

**Additional Corroborating Testimony**

46. Prof. Robin Pinkley (Janet & Craig Duchossois Endowed Professor of Management & Organizations, SMU)—a 35-year veteran of Cox who has served on numerous P&T committees—wrote to Dean Myers that the Department's reliance on "fit" is "self-serving" and "does not stand up when compared to the empirical evidence provided by top-tier publications, citation counts, and invitations to speak at Harvard, London Business School, Kellogg, Berkeley, and Carnegie Mellon."

47. Prof. Pinkley concluded that "Sean Wang's case was not treated in an unbiased manner consistent with the P&T document and our commitment to equity," and warned that the current leadership's pattern of bias "should not be tolerated."

48. Prof. Pab Jotikashtira (Full Professor of Finance, SMU; member, Provost's Advisory Committee on Tenure & Promotion) compared Dr. Wang's record with the two Indian professors most recently tenured in Accounting.

49. Prof. Jotikashtira found that Dr. Wang is "very significantly more productive than Gauri Bhat" and has "a comparable record to Neil Bhattacharya, who is ten years his senior," adding that "any reasonable person would deem Sean's citation count as more than sufficient for tenure."

50. Prof. Jotikashtira dismissed the Department's quality and "fit" objections as "personal taste" and "absurd," noting that the career success of ten top-tier publications "cannot be due to luck" given the less than ten percent acceptance rates in those journals.

51. Prof. Jeff Hales (Charles T. Zlatkovich Centennial Professor of Accounting, University of Texas at Austin) described Dr. Wang as "an outstanding researcher with few comparable peers."

52. Benchmarking against recent promotions at top-twenty business schools, Prof. Hales wrote that Dr. Wang's 11 peer-reviewed articles (10 Financial Times Top 50 Journals) and over 1,650 citations would already match the average full-professor dossier, and that Dr. Wang has "more citations than I had at a similar point in my career." He concluded that SMU hired Dr. Wang "to do exactly this kind of research—and he delivered."

53. Prof. David Wood (Glenn D. Ardis Professor of Accounting, Brigham Young University) noted that SMU's claim that Dr. Wang did not meet the research standards as "ludicrous" and that Dr. Wang met the research bar for full even for top 20 schools.

54. These independent assessments—by senior scholars who (i) hold or have held decision-making roles in promotion and tenure, (ii) cover both the Accounting and Management disciplines, and (iii) have no stake in this litigation—confirm that SMU's purported reasons ("lack of impact," "poor fit," or "subpar quality") cannot be taken seriously.

55. As Prof. Pinkley observed, the Department "changed the rules in the middle of the game," while Prof. Jotikashtira and Prof. Hales demonstrate that, by any neutral benchmark, Dr. Wang exceeds the standard for tenure.

**Discriminatory Office Assignments**

56. In Spring 2024, when offices were reassigned in the department's new building, SMU assigned offices in a segregated manner.

57. SMU assigned Indian male faculty (Dr. Desai, Dr. Tomar, Dr. Bhattacharya) to prime offices overlooking Bishop Boulevard and the quad.

58. SMU assigned East Asian faculty (Dr. Liu, Dr. Yoon, and Dr. Wang) to offices on the opposite end of the hallway, away from the preferred locations.

59. These office arrangements were non-random and reflected cultural segregation within the department.

**Misclassification of Race**

60. On its official "Faculty Permission to Hire Form", Dr. Wang was recorded in SMU's HR/EEO records as "White" despite self-identifying as Chinese/East-Asian. On information and belief, Dr. Wang did not supply or approve that entry, and the misclassification remained uncorrected until at least April 2022.

61. This misclassification was not a typographical error, i.e. clicking the wrong box for race, as "white" was *typed* into the form, and Dr. Wang's surname (Wang) and multiple face-to-face meetings made his ethnicity obvious.

62. By misclassifying Dr. Wang as White, the department effectively created false records that removed recognition of his minority status from official records.

**Predetermined Discrimination and Retaliation**

63. In February 2024, six months before Dr. Wang would submit his tenure dossier, Drs. Desai and Shaw explicitly told him that regardless of his academic record, citation impact, or quality of outside letters, he would receive negative votes from both the department and the Promotion and Tenure Committee.

64. This predetermination of outcome, made 6 months before Dr. Wang would submit a tenure dossier, demonstrates discriminatory intent.

65. SMU broke its own written rules to deny Dr. Wang tenure—issuing an unauthorized third-year review outcome, failing to provide required annual evaluations, inventing "fit" as an extra-contractual criterion, penalizing protected research in violation of academic freedom, and moving the goalposts despite Dr. Wang exceeding the published four-publication benchmark.

66. Between the 2023 and 2024 annual reviews, Dr. Wang was called a "bad fit" at least thirteen times by Dr.'s Desai and Shaw.

67. On February 28, 2023, Dr. Wang met with Associate Provost Paige Ware and complained about how he was called a "bad fit" and asked to voluntarily leave the department in a February 2023 mid-career annual review. Dr. Ware responded that "When we start talking about fit into a department as a criteria for tenure versus fit into the field… I wonder if feedback that says you don't fit into a department is the kind of feedback that might itself be a space for inquiry… I have not seen, except in Cox, that there's also a they're supposed to be like we are." She further acknowledges that "one of the cautionary alarm bells for anyone who's looking at DEI is the word fit…. That elusive word fit that spits in the face of data."

68. When Dr. Wang proceeded with his tenure application despite the predetermined negative outcome, he was subjected to retaliation including additional criticism and hostile treatment.

69. On December 17, 2024, Plaintiff met with Chief Diversity Officer Dr. Maria Dixon-Hall and strongly opposed discriminatory practices in his tenure review, including the

Department's use of the term "fit," conflicts in reviewer selection, and disparities favoring candidates of Indian ancestry and disfavoring non-Indian candidates.

70. Dr. Dixon-Hall acknowledges Dr. Wang's situation as a compelling discrimination case and asks Dr. Wang to bring her a printed copy of the evidence in an unmarked manila envelope, because she feared retaliation if the data were to get "forwarded all around campus."

71. On January 13, 2025, Plaintiff presented the same objections to the Dean, challenging "fit" and the shifting standards.

72. Shortly thereafter, on January 30, 2025, the Dean ignored Dr. Wang's objective record and issued a one-line negative decision—"not outstanding."

73. On February 20, 2025, Plaintiff appealed to the Provost, expressly opposing race/ethnicity/ancestry-based discrimination, cataloging process irregularities (including conflicted reviewers and denial of the external-letter summary), and challenging the improper use of "fit."

74. On April 7, 2025 the Provost denied the appeal and issued a "terminal year" notice for 2025–26, ending Plaintiff's employment in Spring 2026.

75. On April 17, 2025, Plaintiff appealed to the President, again opposing discrimination under Civil Rights Act of 1866 and identifying the same procedural violations. The President promptly denied the appeal and closed the process without remand or remediation.

**Violation of Academic Freedom**

76. Dr. Desai stated on multiple occasions, including November 19, 2024, that Dr. Wang's research on race-based discrimination "made people uncomfortable," despite it being fully peer-reviewed and published in top journals.

77. Notably, Dr. Wang's Indian colleague Sorabh Tomar has since published similar research on race-based diversity and human behavior, which was viewed positively by Dr. Desai.

78. This disparate treatment of similar research based on the race of the researcher violates principles of academic freedom and equal treatment.

**Tenure Denial Despite Outstanding Record**

79. On November 19, 2024, Dr. Desai informed Dr. Wang of a negative department vote of 3-1, with all three Indian faculty voting against tenure and the one non-Indian faculty member voting in favor.

80. On December 9, 2024, the Promotion and Tenure Committee voted three to two against Dr. Wang, with Dr. Shaw casting the deciding vote.

81. On January 30, 2025, Dr. Myers denied Dr. Wang's tenure application, stating only that Dr. Wang had "failed to achieve 'outstanding' performance."

82. Dr. Myers' conclusion is objectively false, as Dr. Wang's record far exceeds that of his tenured Indian colleagues and places him in the top tier of accounting scholars nationally.

83. Dr. Wang appealed his denial and filed grievances based on discrimination.

84. Dr. Wang filed a discrimination charge with the Equal Employment Opportunity Commission.

85. SMU knew about the discrimination claims.

86. SMU conducted sham investigations.

87. SMU conducted a sham appeal process.

88. SMU terminated Dr. Wang's employment because of unlawful discrimination based on race and national origin and in retaliation for Dr. Wang's protected activity of reporting and opposing unlawful discrimination.

## CAUSES OF ACTION

**Violation of the Civil Rights Act of 1866 - Race and National Origin Discrimination**

89. Dr. Wang incorporates by reference all preceding paragraphs.

90. SMU discriminated against Dr. Wang based on his race/ethnicity/ancestry/national origin (Chinese-American) in violation of the Civil Rights Act.

91. SMU's conduct includes applying different and more stringent tenure standards to Dr. Wang than to similarly situated Indian colleagues; segregation of the East Asians to a different side of the building; denying Dr. Wang tenure despite exceeding all published criteria; subjecting Dr. Wang to a hostile work environment; maintaining policies and practices that have a disparate impact on non-Indian faculty; conducting sham investigations; conducting sham appeals; and wrongful termination.

92. SMU's breaches of its own contractual policies—including conducting an unauthorized third-year review outcome, failing to provide required written evaluations, introducing "fit" as an unlawful criterion, and suppressing Dr. Wang's protected academic freedom—further demonstrate that SMU's stated reasons were pretextual.

93. SMU's conduct is intentional, deliberate, willful, and in callous disregard of Dr. Wang's rights.

94. As a direct and proximate result of SMU's discrimination, Dr. Wang has suffered and continues to suffer damages including lost compensation, benefits, career advancement opportunities, and emotional distress.

**Violation of the Civil Rights Act of 1866 - Retaliation**

95. Dr. Wang incorporates by reference all preceding paragraphs.

96. Dr. Wang engaged in protected activity by opposing discriminatory practices within the Accounting Department.

97. On December 17, 2024, Dr. Wang met with Chief Diversity Officer Maria Dixon-Hall to oppose discriminatory practices in his tenure review, including the Department's reliance on "fit," conflicts in external-reviewer selection, and disparities favoring candidates of Indian ancestry and disfavoring non-Indian candidates.

98. SMU took a series of materially adverse actions in close succession: the Dean issued a negative decision on January 30, 2025; the Provost denied Plaintiff's appeal on February 20, 2025 and maintained a predetermined tenure denial and terminating/non-renewing Dr. Wang's employment contract.

99. On April 17, 2025, Dr. Wang filed a complaint to the President appealing the tenure decision and opposing discrimination.

100. On May 5, 2025, the President promptly denied and closed the process.

101. SMU retaliated against Dr. Wang for his protected activity by subjecting him to heightened scrutiny, predetermined negative tenure evaluation, and ultimately denying his tenure application denying Dr. Wang tenure despite exceeding all published criteria; subjecting Dr. Wang to a hostile attitude; exclusion and separation; maintaining policies and practices that have a

disparate impact on non-Indian faculty; conducting sham investigations; conducting sham appeals; and wrongful termination.

102. SMU's retaliation also included continuing breaches of its contractual policies, which serve as further evidence that the adverse actions were pretextual and carried out in bad faith.

103. SMU's retaliatory conduct was intentional, reckless, and designed to punish Dr. Wang for opposing discrimination.

**INJUNCTIVE RELIEF**

104. Because of the substantial likelihood of Dr. Wang's success on the merits, the substantial threat of irreparable injury to him in the absence of an injunction, the balance of hardships favors Dr. Wang, and the interests of the public, preliminary and permanent injunctive relief is warranted.

105. Dr. Wang requests the Court to issue preliminary injunction, upon an appropriate motion, as it sees necessary to preserve the status quo of the parties.

106. Dr. Wang should be fully reinstated to his tenure-track position and retain him until such time as he is removed for cause in the same manner that tenured faculty members are removable.

107. Dr. Wang requests that all unlawful race discrimination and retaliation with respect to his employment be eliminated and SMU be compelled ultimately, after a full trial, to appoint him to the faculty with tenure.

**DAMAGES**

108. As a direct and proximate result of SMU′s unlawful conduct, Dr. Wang has suffered and continues to suffer:

    a. lost wages, benefits, and other compensation;

    b. lost career advancement opportunities;

    c. damage to professional reputation;

    d. emotional pain, suffering, inconvenience, mental anguish, and loss of enjoyment of life;

    e. other economic and non-economic damages; and

    f. attorneys′ fees and costs.

109. SMU's conduct was intentional, malicious, and conducted with reckless indifference to Dr. Wang′s federally protected rights, warranting punitive damages.

**PRAYER FOR RELIEF**

WHEREFORE, Dr. Wang respectfully requests that this Court:

    A. assume jurisdiction over this matter;

    B. declare that SMU's conduct violated the Civil Rights Act;

    C. enter preliminary and permanent injunctive relief requiring SMU to:

        1. grant Dr. Wang tenure and promotion to Associate Professor;

        2. grant Dr. Wang an expedited, conflict-free review for promotion to Full Professor with appropriate retroactive compensation adjustments if the fact-finder determines Dr. Wang′s qualifications warranted such promotion at the time tenure was denied;

        3. cease discriminatory practices in tenure and promotion decisions;

        4. implement and enforce written policies prohibiting the use of subjective "fit" criteria in tenure decisions and requiring

        documentation of legitimate, non-discriminatory reasons for all negative tenure decisions;

D.     award Dr. Wang compensatory damages in an amount to be proven at trial;

E.     award Dr. Wang punitive damages;

F.     award Dr. Wang back pay, front pay, and benefits;

G.     award Dr. Wang reasonable attorneys' fees and costs;

H.     award pre- and post-judgment interest; and

I.     grant such other relief as the Court deems just and proper.

## JURY DEMAND

Dr. Wang demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Brian P. Sanford*
Brian P. Sanford
Texas Bar No. 17630700
bsanford@sanfordfirm.com
Elizbeth "BB" Sanford
Texas Bar No. 24100618
esanford@sanfordfirm.com

**THE SANFORD FIRM**
2711 Hibernia Street
Dallas, TX 75204
Ph:  (214) 717-6653
Fax: (214) 919-0113

**ATTORNEYS FOR PLAINTIFFS**